1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9                  FOR THE DISTRICT OF OREGON

10

11  JODY BLAZER,                    )
                                    )   No. CV 07-109-HU
12                Plaintiff,        )
                                    )
13        v.                        )
                                    )   FINDINGS AND
14  MICHAEL J. ASTRUE,              )   RECOMMENDATION
    Commissioner, Social           )
15  Security Administration,       )
                                    )
16                Defendant.        )
                                    )
17  ────────────────────────────────

18  Rory Linerud
    PO Box 115
    Salem, Oregon 97308
19       Attorney for plaintiff

20  Karin J. Immergut
    United States Attorney
21  District of Oregon
    Britannia Hobbs
22  Assistant United States Attorney
    1000 S.W. Third Avenue, Suite 600
23  Portland, Oregon 97204

24  David J. Burdett
    Special Assistant United States Attorney
25  Office of the General Counsel
    Social Security Administration
26  701 Fifth Avenue, Suite 2900 M/S 901
    Seattle, Washington 98104

27

28  FINDINGS AND RECOMMENDATION Page 1

Attorneys for defendant

HUBEL, Magistrate Judge:

Jody Blazer brings this action pursuant to Section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying his application for disability insurance benefits under Title II of the Social Security Act, and Supplemental Security Income benefits under Title XVI of the Social Security Act.

### Procedural Background

Mr. Blazer filed an application for benefits on August 30, 2001, alleging disability since February 2001 based on musculoskeletal impairments, headaches, difficulty sleeping, and hand tremors. The application was denied initially and upon reconsideration. On January 26, 2004, after an administrative hearing, Administrative Law Judge (ALJ) Jean Kingrey issued a decision finding Mr. Blazer not disabled. When the Appeals Council declined to grant review, the ALJ's decision became the final decision of the Commissioner. Mr. Blazer requested review by the United States District Court. By stipulation, the case was reversed and remanded for further proceedings on January 10, 2005. The stipulated order states that upon remand, the ALJ is to further develop the record on the effects of Mr. Blazer's limitations, including re-evaluating the medical evidence, making a new determination on disability, and issuing a new decision.

A second hearing was held before ALJ Kingrey on August 10,

FINDINGS AND RECOMMENDATION Page 2

2006. The ALJ took testimony from a medical expert (ME) and a vocational expert (VE). On November 22, 2006, the ALJ issued a decision finding Mr. Blazer not disabled.

Mr. Blazer was born in 1958. He was 42 years old at the alleged onset of disability and 48 years old at the time of the ALJ's second decision. Mr. Blazer has an 11th grade education. His past relevant work is in the logging industry, including jobs as a choker setter, chaser, rigging slinger, and tree planter. Mr. Blazer meets the insured status requirements of the Social Security Act through March 31, 2005. He has not worked since February 2001.

**Medical Evidence**

On February 1, 2001, while working as a choker setter, Mr. Blazer slipped and fell, injuring his lower back. Tr. 278. Upon examination, Douglas Orsel, M.D., concluded that Mr. Blazer showed moderate, diffuse lumbar tenderness and diminished range of motion in all planes secondary to pain. Id. There were no sensory deficits, motor strength was normal, and straight leg raising was positive. Id. Dr. Orsel diagnosed acute lumbar strain and Mr. Blazer was given analgesics. Id. He was placed on modified work with no bending or stooping and no lifting over five pounds. If no light duties were available, he was to be considered temporarily disabled. Id.

Mr. Blazer was followed by Robert Gerber, M.D., in the Occupational Medicine Department of NBMC Medical Centers. On February 8, 2001, Dr. Gerber noted that Mr. Blazer complained of pain in his "low pelvis," trouble sleeping because of pain, and

FINDINGS AND RECOMMENDATION Page 3

1  some mild urinary incontinence. Tr. 294. Physical examination
2  showed tenderness just to the left of midline at about L5-S1. Id.
3  Dr. Gerber thought radiculopathy was a concern, "in that he is
4  having symptoms involving his bladder and also some constipation."
5  Id. Dr. Gerber ordered an MRI and started him on physical therapy,
6  as well as prednisone for five days. Id.

7      On February 8, 2001, Mr. Blazer had an MRI of the lumbar spine
8  to investigate complaints of bilateral radiculopathy. Tr. 283. The
9  MRI showed diffuse disk bulging at L1-2, flattening the anterior
10 aspect of the thecal sac, especially on the left; relatively severe
11 diffuse disk bulge at the L3-4 level with flattening of the thecal
12 sac and mild to moderate spinal stenosis; focal disk protrusion at
13 L4-5, causing moderately severe spinal stenosis with mass effect on
14 the thecal sac; and less severe central focal bulge at L5-S1 that
15 did not cause significant spinal stenosis. Tr. 283-84.

16     Examining orthopedic surgeon Steven Schilperoort, M.D.,
17 interpreted the MRI on March 29, 2001 as evidence of degenerative
18 disc disease at L1-2, L3-4, and L4-5, with bulging at all levels
19 and moderately severe spinal stenosis based on a combination of
20 facet degenerative changes, ligamentum flavum hypertrophy and disc
21 bulge with a mass effect on the thecal sac. Tr. 298. Less severe
22 disc bulge was noted at L5-S1. Id.

23     On February 13, 2001, Mr. Blazer was seen by Dr. Gerber. Tr.
24 292. He reported being neither better, nor worse. Id. He had some
25 urinary urgency and continuing constipation. Id. Dr. Gerber
26 reviewed the MRI and noted that it showed a diffuse disk bulges
27
28 FINDINGS AND RECOMMENDATION Page 4

impinging upon the thecal sac, as well as spinal stenois at several sites. _Id._ Dr. Gerber prescribed Celebrex and Zanaflex. _Id._

On February 14, 2001, Dara Parvin, M.D., an orthopedic surgeon, examined Mr. Blazer. Upper extremities showed negative impingement, with full range of motion of both upper extremities. Tr. 326. There was a slight amount of tenderness in the lumbar spine and a moderate amount of spasm in the paraspinous muscles. Forward flexion was about 45 degrees and extension was about 5 to 10 degrees. Lateral rotation was painful. _Id._ Mr. Blazer had full range of motion of his hips, knees and ankles. Straight leg raise was negative. _Id._

On February 21, 2001, Dr. Gerber noted that Mr. Blazer reported he was beginning to improve and had no weakness of the lower extremities. _Id._ Dr. Gerber wrote that Dr. Parvin wanted to continue conservative therapy, including physical therapy, which Mr. Blazer was still attending. _Id._ Mr. Blazer said he was still having trouble sleeping. _Id._ He was continued on Celebrex and Empirin #3, and was noted to be "much more comfortable than on previous visits." _Id._

On March 2, 2001, Mr. Blazer told Dr. Gerber the pain down his right leg had improved markedly and was now minimal. Tr. 288. He also reported improved control and "power," with decreased pain, but still some low back pain. _Id._ He had some tenderness in the lumbar area, but good motor strength except with heel raise on the right. _Id._ Dr. Gerber's diagnostic impression was acute low back strain, radiculopathy, and right sciatica. _Id._ He was continued on

FINDINGS AND RECOMMENDATION Page 5

1  Celebrex. Id.

2      On March 6, 2001, Dr. Parvin wrote a chart note stating that
3  on February 26, 2001, Mr. Blazer had contacted the office with
4  complaints of gradually worsening numbness and weakness in the
5  right leg. Tr. 316. Mr. Blazer was advised to use a Medrol Dose-Pak
6  and present to the emergency room if he had any worsening of
7  numbness and weakness. Tr. 317. Dr. Parvin wrote that as of March
8  6, 2001, Mr. Blazer stated that the Medrol Dose-Pak had given him
9  some relief of the back pain, but that the numbness and weakness
10 were neither better, nor worse. Tr. 317. He complained of constant
11 numbness and weakness in the right leg, not previously present. Id.

12     Upon examination, Mr. Blazer had no paraspinous spasm or
13 tenderness. Tr. 317. There was some difficulty with lumbar
14 extension, in that it caused some radicular symptoms in the lower
15 extremities bilaterally, right greater than left. Forward flexion
16 caused back pain. Id. Bilateral upper extremities had adequate
17 range of motion, with no tenderness to palpation. Hips, knees, feet
18 and ankles had adequate nontender range of motion, no tenderness to
19 palpation. Id. Neurologically, Mr. Blazer had full strength in the
20 upper and lower extremities, except with left dorsiflexion, which
21 was variable. Id. There were two Waddell's signs.[1] Dr. Parvin wrote

22

23     [1] Waddells signs are a group of eight physical signs (skin
24 discomfort on light palpation; tenderness across multiple somatic
   boundaries; report of pain when the top of the head is pressed;
25 pain reported on rotating the shoulders and pelvis together;
   absence of pain on distracted straight leg raise; stocking
26 distribution of sensory loss or sensory loss in an entire
   extremity or side of the body; weakness that is jerky, with
27 intermittent resistance; and exaggerated painful response to a

28 FINDINGS AND RECOMMENDATION Page 6

1   that "it is felt that the patient does have a baseline of weakness

2   on the right that was not initially present on his examination from

3   2/14/01." Tr. 318. Dr. Parvin diagnosed multi-level variable

4   degrees of stenosis in the lumbar spine, both centrally and in the

5   neuroforamina, secondary to disk herniation/protrusion, with

6   progressive radiculopathy (weakness, numbness and pain). Tr. 318.

7         In Dr. Parvin's opinion, Mr. Blazer presented a somewhat

8   "confusing picture," with multiple levels of pathology. Id. The L1-

9   2 level did not appear to be contributing to his current

10   radiculopathy, and it was questionable whether the L5-S1 level was

11   significantly involved. Id. The L3-4 and L4-5 levels appeared to be

12   the most significantly involved levels. Tr. 319.

13         Dr. Parvin recommended a decompressive procedure to address

14   the involved lumbar spine, but was not willing to offer Mr. Blazer

15   surgical intervention based only on MRI findings because of the

16   confounding factors on examination, including variable effort and

17   some Waddell's signs. Id. However, despite the variable effort and

18   the Waddell's signs, Dr. Parvin opined that Mr. Blazer "does have

19   underlying weakness and numbness." Id.

20         On March 19, 2001, Mr. Blazer reported that strength in his

21   right leg waxed and waned, and that he had pain radiating down the

22   leg and across the bottom of his right foot. Tr. 286. He was not

23   currently on medication, but was strongly encouraged by Dr. Gerber

24   to consider an anti-inflammatory and to consider surgery. Id. At

25

26   stimulus), first described by Waddell G, McCulloch JA, Kummel E,

      and Venner RM in "Nonorganic Physical Signs in Low-Back Pain,"

27   *Spine* 5:117-25 (1980).

28   FINDINGS AND RECOMMENDATION Page 7

that time, Mr. Blazer changed his primary treating physician to Dr. Parvin. Id.

On March 29, 2001, Mr. Blazer was given an independent medical evaluation by Steven Schilperoort, M.D., an orthopedic surgeon. Tr. 295. Dr. Schilperoort reviewed medical records from Doctors Orsel, Gerber and Parvin. On physical examination, Mr. Blazer was extremely well conditioned with good posture, except that his right shoulder was down and there was evidence of a mild left thoracic scoliosis. Tr. 297. He had a notable limp on the right. Id. Heel ambulation showed collapse on the right. Id.

On physical examination, Mr. Blazer's lumbar flexion was 62 degrees; extension was 4 degrees; and lateral flexion was 32 degrees on the right and 42 degrees on the left. Tr. 298. Thoracic flexion was 30 degrees; rotation was 20 degrees on the right and 14 degrees on the left. Hip flexion was 120 degrees on the right and 140 degrees on the left; hip extension was 30 degrees on the right and 0 degrees on the left.

Dr. Schilperoort diagnosed multilevel spondylosis changes at L1-2, L3-4, L4-5, and L5-S1, most marked at L4-5, with combined facet degenerative joint disease, degenerative disc disease, disc bulge secondary to the degenerative disc disease, and variable levels of spinal stenosis, moderately severe at L4-5, all evolutionary, degenerative in nature, preexistent and not causally related to the February 1, 2001 fall. Tr. 299. Dr. Schilperoort noted "clear evidence of real collapse of tibialis anterior on heel ambulation," but the hypesthesia noted in the right lower extremity

FINDINGS AND RECOMMENDATION Page 8

did not follow recognizable anatomic lines, and Dr. Schilperoort felt it to be invalid. Lumbar spine extension was severely limited, and "this is felt to be a real limitation and based on the multilevel facet degenerative changes." Dr. Schilperoort differed with Dr. Parvin's assessment, concluding that the bulges contributory to the spinal stenosis were degenerative rather than traumatic, and that they should not be described as a herniation, but rather as a bulge/protrusion. Id. In Dr. Schilperoort's opinion, Mr. Blazer's current condition was based on preexisting degenerative changes. Id. Dr. Schilperoort noted that "[v]irtually the entire lumbar spine" had spondylotic changes which included degenerative disc disease, degenerative disc bulging, ligamentum flavum hypertrophy, facet degenerative joint disease with osteophyte formation and, most particularly at L3-4 and L4-5, significant spinal stenosis. Tr. 300.

On April 18, 2001, Mr. Blazer saw Dr. Parvin, who reviewed his cervical and lumbar spine x-rays and MRI. Tr. 315, 312. X-rays of the cervical spine revealed cervical spine kyphosis and some instability with a listhesis at the C5-6 level, with disk-space narrowing. Tr. 312. He also had some degenerative changes throughout. Id. The lumbar spine x-rays and MRI revealed multi-level variable degrees of stenosis, both centrally and in the neuroforamina, secondary to disk herniations/protrusions, with radiculopathy. Dr. Parvin diagnosed 1) lumbar spine stenosis with radiculopathy; 2) cervical spine spondylosis with degenerative changes, resulting in kyphosis; and 3) cervical spine instability,

FINDINGS AND RECOMMENDATION Page 9

C5-6, with disk-space narrowing, possibly contributing to radicular symptoms in the upper extremities. Tr. 312.

Dr. Parvin discussed treatment options. Mr. Blazer had made up his mind to accept his level of symptoms and function, stating that he did not wish to consider surgical intervention. Id. For this reason, he was advised that he should not undergo a CT myelogram, as this was an invasive procedure, not advised except as a "road map" for surgical intervention. Id.[2] Dr. Parvin noted that Mr. Blazer would undergo an MRI scan of the cervical spine and then would be reevaluated. Id.

On April 19, 2001, Dr. Parvin wrote a letter concurring with Dr. Schilperoort's findings, and specifically noting that he did not disagree with Dr. Schilperoort's conclusion that the bulges should not be described as herniation. Tr. 313. Dr. Parvin believed the use of the term "herniation" versus "bulge" or "protrusion" was a "matter of semantics," and also felt that Mr. Blazer had significant degenerative changes in his spine. Id. Dr. Parvin did not feel the cause of the bulges/stenosis was traumatic, but did feel that Mr. Blazer's symptoms represented, at least partly, "an exacerbation that was brought on by his trauma." Id.

---

[2] The record indicates that Mr. Blazer changed his mind about proceeding with surgical intervention after deciding not to have the CT myelogram because of a fear of injections. Tr. 315, 319. Dr. Parvin observed that Mr. Blazer appeared "quite shaken" after the appointment for the CT myelogram, and asked for two weeks to consider the procedure. Tr. 320. Dr. Parvin advised him that "time is of the essence when dealing with numbness or weakness," and "once numbness and weakness are present for greater than two weeks, they are not reliably reversed with surgical intervention." Id.

FINDINGS AND RECOMMENDATION Page 10

An MRI of the cervical spine done on April 23, 2001 revealed no focal herniation or visibly significant spinal stenosis at C2-3, C3-4, or C4-5; loss of disk height and "fairly prominent" disk bulge marginal osteophyte complex extending across the posterior disk space at C5-6, as well as indenting and flattening of the anterior cord and a moderate degree of central stenosis with near complete effacement of CSF about the cord periphery; similar hard changes resulting in at least moderate central stenosis at C6-7, with the cord being slightly flattened with near complete effacement of CSF about the cord periphery and significant encroachment upon the left neuroforamen. Tr. 331. Overall, there was mild reversal of the normal cervical lordosis. Id.

Mr. Blazer was seen by Stephen J. McGirr, M.D., for a neurological second opinion on April 25, 2001. Tr. 308. In a letter to Dr. Parvin, Dr. McGirr noted that Mr. Blazer complained of persistent back pain and leg pain, more so on the right. Tr. 308. Pain was worsened by upright postures, flexion, prolonged sitting or lifting and flexion or by twisting. Id. He had been tried on a Medrol steroid dosepak with minimal improvement. Physical therapy for three weeks had not led to improvement. Id. Dr. McGirr agreed that the MRI of the lumbar spine showed degenerative changes at multiple levels, although he disagreed with the diagnosis of moderately severe spinal stenosis at L4-5. Tr. 310. Dr. McGirr thought discography was required to assess whether Mr. Blazer had sustained a substantial discal injury from the fall and to corroborate that there was minimal to absent nerve root

FINDINGS AND RECOMMENDATION Page 11

involvement. Tr. 310.

Dr. Parvin saw Mr. Blazer on May 25, 2001. Tr. 304. Dr. Parvin noted that Mr. Blazer had been followed for multiple problems, including multi-level variable degrees of stenosis, both centrally and in the neuroforamina, secondary to disk herniations/protrusions, with progressive radiculopathy in the past in the lower extremities. Dr. Parvin wrote that Mr. Blazer had also complained of significant neck pain and bilateral upper extremity numbness, tingling and weakness, as well as headaches, on his last visit. MRI of the cervical spine had revealed significant stenosis at the C5-6 and C6-7 levels, secondary to disk herniation and degenerative changes. Tr. 365. Dr. Parvin wrote, "The patient's listhesis contributes to this very severe stenosis." Id.

At the visit of May 25, 2001, Dr. Parvin wrote, Mr. Blazer was "overwhelmed by his multiple problems." Tr. 304. Dr. Parvin disagreed with Dr. McGirr's recommendation of discography because "the diseased disks causing the diskogenic pain would not necessarily be responsible for his radicular symptoms." Id.

After examination, Dr. Parvin's diagnostic impressions were 1) severe cervical stenosis at C5-6 and C6-7, contributing to gradually progressive left upper extremity radiculopathy; 2) lumbar spine multi-level variable degrees of stenosis, both centrally and in the neural foramina, secondary to disk herniation/protrusions, with radiculopathy; and 3) cervical spine spondylosis and instability with kyphosis, contributing to the cervical spine problems. Tr. 305-06.

FINDINGS AND RECOMMENDATION Page 12

1     Treatment options were reviewed in detail. Tr. 306. Mr. Blazer
2 was noted to have some progressive radiculopathy in the left arm,
3 and Dr. Parvin acknowledged that the MRI of the cervical spine was
4 "quite impressive." Id. Dr. Parvin advised that the progressive
5 radiculopathy was an indication for surgical intervention, and
6 advised Mr. Blazer that he required urgent intervention consisting
7 of an anterior decompressive procedure followed by anterior fusion
8 and instrumentation and grafting from C5 to C7, to address the
9 stenosis and progressive symptoms. Id.

10     Dr. Parvin advised that the alternative to surgery was to
11 "accept his current level of dysfunction (pain, weakness, numbness)
12 as well as to accept and be comfortable with any future worsening
13 of his radicular symptoms that may occur with time." Id.

14     Mr. Blazer told Dr. Parvin that he had social and legal
15 obligations that prevented him from proceeding with surgical
16 intervention, and stated that he understood the consequences of
17 allowing continuation of the progressive radiculopathy. Id. He was
18 advised that allowing progression to continue might "result in
19 eventual myelopathic features and loss of the use of his arms or
20 legs." Id.

21     With regard to the lumbar spine and lower extremity radicular
22 symptoms, Mr. Blazer indicated the desire to accept and live with
23 his symptoms. Id. For that reason, his doctors had not further
24 pursued the diagnostic workup such as the CT myelogram, but Dr.
25 McGirr had gone forward with the diskogram. Id. Dr. Parvin agreed
26 with Dr. McGirr that Mr. Blazer required further workup prior to

27

28 FINDINGS AND RECOMMENDATION Page 13

proceeding with any intervention, and that the workup could consist of a diskogram, but only to help to identify the source of diskogenic pain, not the source of radiculopathy. Tr. 307. Mr. Blazer said he wished to continue with his current level of symptoms and did not wish any intervention at that time. Id.

Dr. Parvin agreed that Mr. Blazer could not work with his current condition, noting, "If the patient accepts his progressive upper extremity radiculopathy and wishes to live with his lower extremity radicular symptoms, I feel that he will be significantly disabled." Id.

On July 19, 2001, Mr. Blazer was evaluated by Anthony J. Smith as part of an independent orthopedic evaluation for the Dispute Resolution Section of the Workers' Compensation Division. Tr. 336. Dr. Smith wrote that Mr. Blazer's current complaints were of weakness, numbness and aching involving his left arm, shoulders and right leg, as well as pain in his neck and low back. Tr. 338. Mr. Blazer said he was also suffering from severe headaches, which he had never had before. Id. He reported that his neck was always sore and associated with pain across his shoulders extending down the right arm along the ulnar side of the forearm and into the hand; that his back was stiff and achy in the morning, with discomfort extending into the right foot, but with symptoms decreasing after he was up and around; and a hot, stabbing pain in the right lateral thigh, with aching in the right calf. Id.; tr. 339.

Upon examination, Dr. Smith observed that Mr. Blazer's gait showed a slight limp on the right side, and that he had difficulty

FINDINGS AND RECOMMENDATION Page 14

with heel walking on the right and was unable to walk on the toes on the right side. His left shoulder was lower than the right, indicating minimal left lower dorsal scoliasis. When he stood, there was prominence of the right paravertebral musculature from the mid thoracic to the mid lumbar area, but the region was not tender to palpation. Tr. 339. Range of motion of the thoracic spine was 30 degrees of flexion. Id. Right rotation was 18 degrees and left rotation was eight degrees. Id. Range of motion of the lumbosacral spine was 32 degrees of flexion, eight degrees of extension, 22 degrees of right lateral flexion and 14 degrees of left lateral flexion. Tr. 340.

Right hip flexion was 120 degrees. Left hip rotation was 130 degrees. Tr. 340. Sensory examination showed marked hypesthesia, "practically anesthesia," in a stocking distribution from the junction of the thigh with the abdomen downward to the toes, including the sole of the foot. Tr. 340. On testing strength in the lower extremities, there was giveway in all muscles on the right side from the hip down. Id. Dr. Smith found a loss of muscle strength in the entire right lower extremity, which he felt represented either giving way secondary to pain or lack of effort. Tr. 341. Strength on the left was normal. Thigh and calf circumferences were greater on the right than on the left. Id.

There was a positive Waddell's rotation test and compression test. Tr. 339. Dr. Smith diagnosed ongoing low back and right leg pain, following the injury of February 1, 2001 superimposed on diffuse degenerative changes in the lumbosacral spine, and cervical

FINDINGS AND RECOMMENDATION Page 15

and left upper extremity symptoms that were not evaluated. Tr. 340.

Dr. Smith wrote,

> I find it very hard to sort out the findings on Mr.
> Blazer's back and leg. Some of the findings are of
> concern such as his urinary urgency and mild
> incontinence. The limitation of motion of the thoracic
> spine is similar to that found by Dr. Schilperoort on
> March 29th. The ranges of motion of the lumbar spine show
> considerably less flexion, and left lateral flexion today
> than when he was seen by Dr. Schilperoort. There are
> functional findings today such as the positive Waddell's
> signs and the failing the kneeling bench test[3] which make
> it difficult to evaluate his motion. He had collapse of
> the anterior tibial muscle with heel walking when
> examined by Dr. Schilperoort. This was not found by Dr.
> McGirr. It was present to some degree today. Drs.
> Schilperoort and McGirr found that he could ambulate on
> his toes whereas today he was unable to on the right
> side. Dr. Schilperoort found normal motor strength to
> manual testing whereas today he had givingway [sic] of
> all muscles in the right lower extremity. Today there was
> some depression of the right ankle jerk which appeared
> definite. Mr. Blazer's history indicates that he had no
> similar problems before his injury. I believe that this
> represents a combined condition of the trauma
> superimposed on pre-existing degenerative changes with
> precipitation of his symptoms by the trauma but
> perpetuation of them because of the pre-existing
> degenerative changes. I would agree with Dr. Schilperoort
> that the major contributing cause of his present symptom
> complex is the degenerative changes rather than the
> injury itself.

Tr. 340-41.

Dr. Smith thought Mr. Blazer was limited in the repetitive use of his spinal area as a result of the combination of the degenerative change and the acute injury. Tr. 341.

Dr. Smith's residual functional capacity assessment was that

---

[3] In the bench test, also called Burn's test, the patient is asked to kneel on a chair or bench 12" high and touch the floor. Because the knees are bent, patients with true back pain or sciatica should be able to do the test without difficulty; those with nonorganic back pain usually cannot. Kiester PD, Duke AD "Is It Malingering or Is It Real?" Postgrad Med 1999:106(7):77-84.

Mr. Blazer could lift and carry 15 pounds frequently and 25 pounds occasionally. Dr. Smith noted that Mr. Blazer thought he could sit 30-45 minutes at a time, stand for 10-20 minutes, and walk for 20 minutes; Dr. Smith thought it would "take a physical capacities evaluation to confirm this." Tr. 341. Dr. Smith thought Mr. Blazer was permanently precluded from activities requiring frequent stooping, crawling and twisting, but that he was able to climb, reach, crouch, kneel, balance, push and pull frequently. Dr. Smith wrote, "He could probably work the same number of hours now that he did prior to his injury but today's examination suggests that it would have to be at a much lower level of activity, possibly even at a sedentary level." Id. Dr. Smith did not think Mr. Blazer passed the "validity test of the AMA Guides on the relationship of total sacral motion to straight leg raising," and reported that he had "non-anatomic findings related to numbness in the right leg and weakness in the right leg." Tr. 342. The circumferential measurements of the thigh and calf were larger on the right, which suggested a lack of significant weakness in the muscles of the right leg. Id. Other non-anatomic signs included positive Waddell tests and failure of the kneeling bench test. Id.

        On January 12, 2002, Mr. Blazer was evaluated by Arin Braseth, M.D. Tr. 349. Dr. Braseth diagnosed cervical pain and chronic headaches, per report, with MRI evidence of cervical herniation of discs; chronic back pain, for which he took aspirin, with limited benefit, but was unable to have further evaluations because of lack of finances. Tr. 351-52. Dr. Braseth wrote, "The pain is noted to

FINDINGS AND RECOMMENDATION Page 17

be out of proportion to his examination." Tr. 352.

An X-ray of the lumbar spine done on January 14, 2002, showed mild degenerative disc disease at L5-S1. Tr. 353.

On April 3, 2002, Martin Kehrli, M.D. performed a records review and completed a Residual Physical Functional Capacity Assessment. Tr. 357. In Dr. Kehrli's opinion, Mr. Blazer was able to lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about six hours of an eight hour workday; sit about six hours in an eight hour workday; climb, balance, kneel, crouch, and crawl occasionally and stoop frequently. Tr. 358-60.  The same findings were endorsed by Sharon Eder, M.D., also a Social Security reviewing physician. Tr. 364-369.

On October 2, 2004, Mr. Blazer was evaluated by Peter Verhey, M.D., an internist, on behalf of Social Security Administration. Tr. 530. Mr. Blazer reported back pain, mostly in the neck region; depresion for the past two years, and constant headaches beginning in the back of the neck, ranging from mild to very severe. Id.

On examination, Mr. Blazer had normal gait and coordination except for slightly decreased coordination of his right hand finger to thumb alternating movements. Tr. 531-32. He refused heel and toe testing. Tr. 532. He had slightly decreased thoracolumbar range of motion to flexion, of approximately 70 degrees. His cervical range of motion was 30 degrees on the right and 40 degrees on the left; neck extension was 30 degrees and neck flexion was 30 degrees. Tr. 532. He had mild tenderness to palpation in the cervical spine paravertebral regions, but no crepitus, effusions or deformities.

FINDINGS AND RECOMMENDATION Page 18

Id. He had decreased strength on the right grip with 4/5 and the right proximal muscle groups 4/5 upper extremity. Id.

In Dr. Verney's opinion, Mr. Blazer had moderate degenerative changes in the cervical spine, with the headaches most likely related to the paravertebral spasms as well as being secondary to stress, depression, and smoking two packs of cigarettes a day. Tr. 533. Dr. Verney concluded that Mr. Blazer could stand and walk about six hours out of an eight hour day and carry 100 pounds occasionally and 50 pounds frequently. Dr. Verney did not think any assistive device was necessary, and did not think Mr. Blazer had manipulative limitations or environmental limitations, though he did think Mr. Blazer should not engage in activity that would require a great deal of cervical motion and rotation of the neck. Tr. 533.

X-rays of the lumbosacral spine taken on October 4, 2004 showed mild degenerative disc disease at the lumbar segments, more so at L3-4. Tr. 534.

On October 22, 2004, reviewing psychologist Peter LeBray, Ph.D. concluded that Mr. Blazer had no psychological limitations. Tr. 545.

On October 23, 2004, reviewing physicians Mary Ann Westfall, M.D., a specialist in physical medicine and rehabilitation, and Richard Alley, M.D., a family practice specialist, opined that Mr. Blazer could lift 20 pounds occasionally and 10 pounds frequently, and that he could sit, stand or walk about six hours of an eight hour work day. Doctors Westfall and Alley thought Mr. Blazer had

FINDINGS AND RECOMMENDATION Page 19

additional limitations on reaching in all directions, and that he could only occasionally balance, crouch, or crawl. Tr. 550-51. Reviewing psychologist Dorothy Anderson, Ph.D., concluded on December 13, 2004, that Mr. Blazer's depression produced only mild limitations on his ability to maintain social functioning and to maintain concentration, persistence, or pace. Tr. 565.

**Hearing Testimony**

At the first hearing, on November 8, 2003, Mr. Blazer testified that he had had headaches for the past two and a half years. Tr. 395. He said he also had numbness in both arms, numb fingers, a right leg that "has sometimes worked and sometimes it don't." Id. Mr. Blazer said that if he stayed in one position too long, he had to stand up, needing support when standing up because "it feels like I'm stuck in my back." Id. He said his shoulders felt "like there's jolts or electrics going out and down my arm," mostly in the left arm. His buttocks on the right side felt "like somebody is pushing on the bone inside there." Id. He spent most of his time in a chair, sitting in a reclining position. Tr. 396. He could sit comfortably for only 15-20 minutes. Id. He said his right leg gave out sometimes after he stood up. Tr. 399. Mr. Blazer testified that he found himself "extensively weak in most of my areas where I used to be able to not have any problems of picking things up or grasping things or running." Tr. 402.

Mr. Blazer had not had medical care for the past two years because he does not have medical insurance and cannot afford to obtain care. Tr. 399-400.

FINDINGS AND RECOMMENDATION Page 20

At the second hearing, on August 10, 2006, besides taking additional testimony from Mr. Blazer, the ALJ called a medical expert, Robert Bigley, and a vocational expert (VE), Kay Wise. Tr. 573. At the hearing, Mr. Blazer testified that his legs had become weaker, and that his ability to pick things up and to stand was "getting to be quite extreme," such that he could "get up and fall over real easy." Tr. 578. He said he had numerous headaches. Id. He continued to be unable to afford medical care. Id. Mr. Blazer described the weakness in his legs as being "like there is no muscle there at all. It just turns to water and over I go." Tr. 579.

Mr. Blazer said he was also depressed. Id. His daily activities consisted of watching television and feeding his mother's dog, and if he felt good, "maybe I'll be able to mow the lawn." Id. However, after exertion, he wakes up during the night with pain in his legs, shoulders, arm, neck, and back. Tr. 580. He said he has difficulty writing. Id. He does not use a cane or a walker. Tr. 581.

The medical expert, an internist and retired professor of medicine, testified that Mr. Blazer had "very significant degenerative disc disease which may be responsible for his continuing pain and disability, but I ... say maybe." Tr. 582. Dr. Bigley said he thought Mr. Blazer "might meet [Listing of Impairments] 1.04(a)," tr. 582, but then told the ALJ "[y]ou might consider having those reports [by orthopedic and neurosurgical evaluators in the record as Exhibits B-3F, 4F and 5F] reviewed by

FINDINGS AND RECOMMENDATION Page 21

an appropriate surgical specialist which I am not." Tr. 584. See also tr. 586 ("I think to interpret the data that we have conscisely, it would be very good to have a neurosurgeon or an orthopedic surgeon review those three Exhibits...") The ALJ asked Dr. Bigley about the doctors' reports discussing Waddell's signs, inconsistent effort, non-anatomic findings, and invalid testing, to which Dr. Bigley responded that he "didn't pay any attention to that." Tr. 585.

The ALJ also called Kay Wise, a vocational expert (VE). Tr. 587. The ALJ asked the VE to consider a hypothetical individual of Mr. Blazer's age and education and with the same work history, limited to light work with a sit/stand option and no running or jumping, no work on rough ground, no frequent kneeling, crawling, twisting or crouching, and only occasional overhead reaching. Id. The VE opined that such an individual could not return to Mr. Blazer's past work in the logging industry, but that he could work as an inspector of small wood products (sedentary, unskilled), laminating machine off bearer (light, unskilled, with sit/stand option), and assembler of printed products (light, unskilled, with sit/stand option). Tr. 588-89.

### ALJ's Decision

The ALJ found that Mr. Blazer's alleged depression was not severe, based on the opinions of Doctors LeBray and Anderson. Tr. 414. Mr. Blazer's alleged tremors were also considered non-severe because no diagnosis supporting such an impairment had been made and in fact it was not even noted in the medical record. Tr. 415.

FINDINGS AND RECOMMENDATION Page 22

The ALJ found that Mr. Blazer's degenerative disc disease was a severe impairment, but that it did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ rejected the medical expert's testimony as vague, not reaching a conclusion on this issue, and not indicating when the impairment might have met the listing. The ALJ also cited to medical evidence not supportive of nerve root compression, including non-anatomic pain distribution and negative straight leg raising. The ALJ concluded that Mr. Blazer was able to perform light work, based on the physical capacity assessments of Doctors Eder, Kehrli, Alley and Westfall, as well as the Workers Compensation rating decision. Tr. 416. The ALJ noted that the conclusion that Mr. Blazer could do light work was more restrictive than findings by other examining physicians, including Dr. Verhey, who found Mr. Blazer able to lift 50 pounds frequently and sit without restriction. Id.

The ALJ found Mr. Blazer's testimony not entirely credible about the intensity, persistence, and limiting effects of his symptoms, particularly Mr. Blazer's alleged muscle weakness in his leg, neck, and back, his shoulder pain and stiffness, and his hand tremors. Id. The credibility finding was based on medical findings inconsistent with Mr. Blazer's complaints, such as 1) Dr. Parvin's finding in February 2001 that Mr. Blazer had full range of motion in his upper extremities, hips, knees and ankles with normal strength testing; 2) Dr. Schilperoort's finding in March 2001 that Mr. Blazer had normal muscle strength and normal knee and ankle

deep tendon reflexes; 3) Dr. McGirr's finding in April 2001 that there was no objective evidence of any weakness; 4) the July 2001 finding that although Mr. Blazer exhibited a slight limp, he also showed a full ability to squat and rise; and 5) the observation in January 2002 by Dr. Braseth that Mr. Blazer had normal strength bilaterally and was observed to tie his shoes without difficulty. Tr. 117.

The ALJ noted that the more recent examination of Mr. Blazer by Dr. Verhey in October 2004 revealed normal gait and coordination, and, except for decreased strength in his right grip to 4/5, the rest of the examination was within normal limits. Id. Dr. Verhey also reported that Mr. Blazer's sensation was intact and his reflexes were normal. Id.

The ALJ noted that the possibility of poor effort by Mr. Blazer had been raised as an issue by two examining physicians. Dr. Smith recorded that Mr. Blazer's weakness was episodic and not accompanied by any muscular atrophy. Doctor Schilperoort noted that hypesthesia in the right leg did not follow recognizable anatomic lines, included positive Waddell signs and failure of the kneeling bench test. Dr. Parvin had also noted that Mr. Blazer's effort was variable, and Dr. Braseth had opined that Mr. Blazer's pain complaints were out of proportion to objective findings.

The ALJ concluded that Mr. Blazer retained the residual functional capacity to do light work with some additional restrictions. He was unable to return to his past relevant work, but was able to perform other work existing in the national

FINDINGS AND RECOMMENDATION Page 24

economy, including small wood product inspector, laminating machine off-bearer, and assembler of printed products. Tr. 419.

### Standard

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). In determining whether the Commissioner's findings are supported by substantial evidence, the court must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). However, the Commissioner's decision must be upheld even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

The initial burden of proving disability rests on the claimant. Meanel, 172 F.3d at 1113; Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

FINDINGS AND RECOMMENDATION Page 25

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.

In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." <u>Yuckert</u>, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step. <u>Yuckert</u>, 482 U.S. at 141.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude

FINDINGS AND RECOMMENDATION Page 26

substantial gainful activity." <u>Yuckert</u>, 482 U.S. at 140-41. If a claimant's impairment meets or equals one of the listed impairments, he is considered disabled without consideration of her age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he is not considered disabled. <u>Yuckert</u>, 482 U.S. at 141-42. If the claimant shows an inability to perform his past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity to do other work in consideration of the claimant's age, education and past work experience. <u>Yuckert</u>, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

**Discussion**

Mr. Blazer contends that the ALJ erred in 1) rejecting his testimony; 2) determining his residual functional capacity; 3) rejecting the testimony of the medical expert who testified at the hearing; and 4) rejecting the opinions of other medical sources.

1.   Rejection of Mr. Blazer's testimony

Mr. Blazer contends that the ALJ erred in rejecting his testimony about his symptoms, particularly those involving his arms, hands and fingers. He argues that he has trouble with his arms, hands and fingers because of pain and numbness arising from

the cervical disc disease, and that because the ALJ improperly rejected his testimony on these symptoms, the testimony should be credited as a matter of law under Varney v. Secretary, 859 F.2d 1396 (9th Cir. 1988).

Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering. Smolen v. Chater, 80 F.3d 1273, 1281-82 (9th Cir. 1996). A claimant's testimony about pain may be disregarded if it is unsupported by medical evidence which supports the *existence* of such symptoms as pain, although the claimant need not submit medical evidence which supports the *degree* of those symptoms. Bunnell v. Sullivan, 947 F.2d 341, 347 (9th Cir. 1991)(en banc). See also Vertigan v. Halter, 260 F.3d 1044 (9th Cir. 2001)(fact that claimant's testimony not fully corroborated by objective medical findings, in and of itself, is not clear and convincing reason for rejecting it).

With regard to his musculoskeletal symptoms, Mr. Blazer testified that he was unable to pick things up, that he had numbness in both arms and in his fingers, and that his right leg was so weak the muscles felt like water and caused him to fall. He also stated that he had pain in his legs, shoulders, arms, neck and back. The ALJ found this testimony not fully credible.

The objective clinical evidence supports the existence of degenerative disc disease of the lumbar and cervical spine, with resulting radiculopathy. But there are no objective medical

FINDINGS AND RECOMMENDATION Page 28

findings that support Mr. Blazer's testimony about inability to use the arms and fingers; in fact, the objective findings contradict this testimony. See, e.g., tr. 317, 326 (February 2001 examinations by Dr. Parvin showing no limitation of range of motion of upper extremities); tr. 351 (January 2002 examination by Dr. Braseth reporting full motor strength in both arms, intact grip strength, ability to manipulate and tie shoes without difficulty); tr. 531 (October 2004 examination by Dr. Verhey showing normal range of motion of shoulder, elbow, wrist and thumb joints, decreased strength on right grip with 4/5 and right proximal muscle groups 4/5 upper extremity, but all other strength within normal limits); and id. (Dr. Verney's conclusion that Mr. Blazer could lift up to 100 pounds occasionally and 50 pounds frequently).

The ALJ's rejection of Mr. Blazer's testimony about symptoms was based on its inconsistency with other testimony that he could mow his mother's lawn,[4] dress himself, and write. It was also premised on findings by different examining physicians that Mr. Blazer's efforts during examinations were variable, and that he exhibited signs indicating that his musculoskeletal pain was non-organic in nature. Because the ALJ found nothing in the record to indicate a mental disorder, she concluded that "the existence of malingering comes to the fore." Tr. 117. The record supports the ALJ's finding of malingering.

The evidence contains observations by several different

---

[4] Which Mr. Blazer described at the hearing as "a pretty good size lot." Tr. 580.

FINDINGS AND RECOMMENDATION Page 29

doctors that suggested exaggeration of symptoms and pain. In March 2001, Dr. Parvin thought Mr. Blazer presented a somewhat "confusing picture," including variable effort and some Waddell's signs. The same month, Dr. Schilperoort observed that Mr. Blazer's complaints of loss of feeling in the right leg did not follow recognizable anatomic lines, and concluded that the complaint was invalid. In July 2001, Dr. Smith noted, as had Dr. Schilperoort, that Mr. Blazer's right leg hypesthesia was in an anomalous stocking distribution that covered the entire right leg from the junction of the thigh and abdomen to the toes, including the sole of the foot.[5] Dr. Smith also noted giveway in all muscles on the right side, although thigh and calf circumferences did not indicate atrophy, and were in fact larger on the right than on the left. Dr. Smith, like Dr. Parvin, noted positive Waddell's signs, as well as Mr. Blazer's failure of the kneeling bench test. Dr. Smith did not think Mr. Blazer's physical complaints were valid. In January 2002, Dr. Braseth opined that Mr. Blazer's pain was out of proportion to his examination.

In view of the absence of objective clinical findings to support the existence of a condition that could cause Mr. Blazer's alleged inability to use his hands, arms and shoulders, and the affirmative evidence of malingering and exaggeration of symptoms with respect to the right leg, the ALJ was entitled to disregard

---

[5] On other occasions, sensory examination has been intact. See, e.g., tr. 532 (October 2004 examination by Dr. Verney); tr. 351 (January 2002 examination by Dr. Braseth; only exception was decreased sensation over volar ulnar aspect of left forearm).

FINDINGS AND RECOMMENDATION Page 30

Mr. Blazer's symptom testimony. The ALJ's adverse credibility finding was based on both malingering and other inconsistencies in Mr. Blazer's testimony, was based on substantial evidence in the record.

   2.    Determination of residual functional capacity

   Mr. Blazer argues that the ALJ erred in not including in his residual functional capacity assessment the symptoms to which Mr. Blazer testified in his arms, hands and fingers, particularly the "electric jolt" pain in his arms, numbness in his arms, hands and fingers, and difficulty with grasping and holding.

   In arriving at her assessment of Mr. Blazer's residual functional capacity, the ALJ relied primarily on the opinions of non-examining, reviewing physicians Eder, Kehrli, Alley and Westfall. She relied on the opinions of Doctors Alley and Westfall because they were the most recent assessments. Tr. 416.

   Mr. Blazer argues that Dr. Bigley's testimony establishes the error of the ALJ's residual functional capacity assessment. For reasons discussed below, I find no error in the ALJ's rejection of Dr. Bigley's testimony.

   Furthermore, the ALJ's disbelief of Mr. Blazer's allegations of numbness and difficulty handling and grasping things with his hands is supported by substantial evidence of malingering and the absence of objective clinical findings to support these allegations. Even without the opinions of Doctors Eder, Kehrli, Alley and Westfall, this evidence is sufficient to support the ALJ's decision not to include Mr. Blazer's alleged symptoms in his

1  arms, hands and fingers in her functional capacity assessment.

2

3          3.    Rejection of medical expert's testimony

4          Mr. Blazer asserts that the ALJ improperly rejected the

5  testimony of Dr. Bigley, and that she should have accepted his

6  testimony that Mr. Blazer might meet one of the impairments

7  contained in the Listing of Impairments. Mr. Blazer acknowledges

8  that Dr. Bigley's opinion that he might meet a listing was with the

9  proviso that the myelogram, which Dr. Parvin had recommended and

10 Mr. Blazer refused to have, would be necessary to establish whether

11 Mr. Blazer's condition would satisfy this listing, and that Dr.

12 Bigley thought the ALJ should confirm his own opinions with those

13 of a neurosurgeon or an orthopedic surgeon, which Dr. Bigley was

14 not.

15         I find no error in the ALJ's rejection of Dr. Bigley's

16 opinions as vague. Nor do I agree with Mr. Blazer's argument that

17 Dr. Bigley's testimony, even if accepted, establishes that he

18 satisfies the requirements of one of the Listings of Impairments.

19 Most importantly, Dr. Bigley's opinion never got beyond the

20 possibility of meeting a listed impairment. Further, Dr. Bigley

21 qualified his opinion with testimony that a myelogram would be

22 necessary to confirm the prerequisites for a listing, and that his

23 opinions would need to be confirmed with a neurosurgeon or an

24 orthopedic surgeon. Dr. Bigley disclaimed his qualification to

25 express the opinion himself.

26         4.    Rejection of other medical opinions

27

28 FINDINGS AND RECOMMENDATION Page 32

1    Mr. Blazer asserts that the ALJ should have accepted 1) Dr.
2    Smith's findings, which supported the workers compensation
3    disability award of 29% disability for his low back; 2) Dr. Smith's
4    opinion that Mr. Blazer was limited to a sedentary job; 3) Dr.
5    Parvin's opinion that cervical stenosis at C5-6 and C6-7
6    contributed to Mr. Blazer's left upper arm radiculopathy; 4) Dr.
7    Parvin's opinion that if Mr. Blazer elected not to have surgery,
8    progression of his cervical degeneration might result in loss of
9    the use of his arms or legs; 5) Dr. Parvin's opinion that, given
10   Mr. Blazer's subjective complaints and the MRI of the cervical
11   spine, he would not be able to continue in his current line of
12   work; and 6) Dr. Parvin's opinion that if Mr. Blazer did not have
13   the recommended surgery, "I feel that he will be significantly
14   disabled."

15   As a general rule, the opinions of a treating physician carry
16   more weight than an examining physician's, and an examining
17   physician's opinion carries more weight than a reviewing
18   physician's. Holohan v. Massanari, 246 F.3d 1195, 1201-02 (9th Cir.
19   2001). The opinions of specialists concerning matters relating to
20   their specialty have more weight than those of nonspecialists, see
21   id. and 20 C.F.R. § 404.1527(d)(5).

22   An ALJ may rely on the medical opinion of a non-treating
23   doctor instead of the contrary opinion of a treating doctor only if
24   she or he provides "specific and legitimate" reasons supported by
25   substantial evidence in the record. Holohan at 1202. Similarly, an
26   ALJ may reject a treating physician's controverted opinion on the
27
28   FINDINGS AND RECOMMENDATION Page 33

1   ultimate issue of disability only with "specific and legitimate

2   reasons." Id.

3       Dr. Parvin was a treating physician and Dr. Smith was an

4   examining physician.

5       Dr. Smith's opinion that Mr. Blazer had a 29% disability due

6   to degenerative disease in his lumbar spine does not establish that

7   Mr. Blazer is disabled from a Social Security standpoint. The ALJ

8   accepted this opinion to some extent in her finding that Mr.

9   Blazer's degenerative disc disease of the cervical and lumbar spine

10  were severe impairments. I find no error here.

11      The evidence does not support Mr. Blazer's contention that Dr.

12  Smith thought he was limited to sedentary work. Dr. Smith stated

13  that Mr. Blazer was able to

14          lift and carry 15 pounds on a frequent basis and 25
            pounds on an occasional basis. ... It would take a [PCE]
15          to confirm [Mr. Blazer's estimates that he could sit 30-
            45 minutes at a time, stand 10-20 minutes and walk for 20
16          minutes.] He is permanently precluded from activities
            requiring frequent stooping, crawling and twisting.
17          Climbing, reaching, crouching, kneeling, balancing,
            pushing and pulling could be done on a frequent basis. He
18          could probably work the same number of hours now that he
            did prior to his injury but today's examination suggests
19          that it would have to be at a much lower level of
            activity, *possibly even* at a sedentary level.
20
21  Tr. 341 (emphasis added). The ALJ's conclusions conform to all of

22  these opinions. Mr. Blazer's work prior to his injury was heavy to

23  very heavy work. See tr. 587 (VE's testimony). The ALJ found that

24  Mr. Blazer could not return to this work. The ALJ asked the VE to

25  consider an individual limited to light work with a sit/stand

26  option with no running, jumping, or work on rough ground, and no

27  frequent kneeling, crawling, twisting, or crouching. Light work

28  FINDINGS AND RECOMMENDATION Page 34

requires the ability to lift no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 416.967(b), a standard that is more restrictive than the lifting and carrying of 15 pounds frequently and 25 pounds occasionally as posited by Dr. Smith. The ALJ included Dr. Smith's limitations on stooping, crawling, and twisting in the hypothetical to the VE, and even included no frequent kneeling, crawling, twisting or crouching, in contrast to Dr. Smith's opinion that Mr. Blazer was not precluded from these activities.

Dr. Smith did not say that Mr. Blazer was limited to sedentary work, and in fact the specific work limitations Dr. Smith gave do not conform to the requirements of sedentary work. Dr. Smith merely said that Mr. Blazer might *possibly* be limited to sedentary work. The ALJ's findings need not conform to testimony about possibilities.

Dr. Parvin's opinions that if Mr. Blazer elected not to have surgery, progression of his cervical degeneration *might* have certain results, and his opinion that absent the recommended surgery, Mr. Blazer *would be* significantly disabled do not suffice to establish disability, because they are both contingent statements and there is no way to determine what Dr. Parvin meant by "significantly disabled." This is again no more than testimony about possible future limitations. I find no error in the ALJ's refusal to adopt these opinions.

The ALJ made a finding that Mr. Blazer could not return to his past relevant work. This is consistent with Dr. Parvin's opinion

FINDINGS AND RECOMMENDATION Page 35

that, given Mr. Blazer's subjective complaints and the MRI of the cervical spine, he would not be able to continue in his current line of work.

I conclude that the ALJ adopted many of the opinions of Doctors Smith and Parvin; to the extent that she did not accept opinions that were contingent, speculative, or futuristic, I find no error.

## Conclusion

I recommend that the Commissioner's decision be affirmed, and that this case be dismissed.

## Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due September 8, 2008. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due September 22, 2008, and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 22nd day of  August  2008.


                                    /s/ Dennis James Hubel


                                   Dennis James Hubel
                                   United States Magistrate Judge

FINDINGS AND RECOMMENDATION Page 36